# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | | |
|---|---|---|
| AZURE NETWORKS, LLC, et al. | § | |
| | § | |
| Plaintiffs, | § | |
| | § | CASE NO. 6:11-CV-139-LED-JDL |
| v. | § | |
| | § | JURY TRIAL DEMANDED |
| CSR PLC, et al., | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFFS' OPENING BRIEF REGARDING CLAIM CONSTRUCTION

Eric M. Albritton
Texas State Bar No. 00790215
ema@emafirm.com
Stephen E. Edwards
Texas State Bar No. 00784008
see@emafirm.com
Debra Coleman
Texas State Bar No. 24059595
drc@emafirm.com
Michael A. Benefield
Texas State Bar No. 24073408
mab@emafirm.com
ALBRITTON LAW FIRM
P.O. Box 2649
Longview, Texas 75606
Telephone:  (903) 757-8449
Facsimile:  (903) 758-7397

Danny L. Williams
Texas State Bar No. 21518050
danny@wmalaw.com
Christopher N. Cravey
Texas State Bar No. 24034398
ccravey@wmalaw.com
David K. Wooten
Texas State Bar No. 24033477
dwooten@wmalaw.com
David Morehan
Texas State Bar No. 24065790
dmorehan@wmalaw.com
Leisa Talbert Peschel
Texas State Bar No. 24060414
lpeschel@wmalaw.com
**WILLIAMS, MORGAN & AMERSON, P.C.**
10333 Richmond, Suite 1100
Houston, Texas 77042
Telephone:  (713) 934-7000
Facsimile:  (713) 934-7011

**Attorneys for Plaintiffs**

## **TABLE OF CONTENTS**

I.      BACKGROUND AND NATURE OF THE CASE ................................................................. 1

II.     TECHNOLOGY AT ISSUE........................................................................................... 2

        A.      The Patent-in-Suit ............................................................................. 2

        B.      Summary of Patented Technology ........................................................... 2

III.    APPLICABLE LEGAL PRINCIPLES .......................................................................... 7

        A.      The Claims – Not The Specification – Define the Scope Of The Invention ............... 7

        B.      Claim Terms Used In Accordance With Their Ordinary Meaning Do Not Require
                Construction ..................................................................................... 8

III.    CLAIM TERMS AT ISSUE ......................................................................................... 9

        A.      MAC Address ................................................................................... 9

        B.      Separate Class of MAC Address........................................................... 13

        C.      The Availability Phrases .................................................................... 15

        D.      Virtual Entities ............................................................................... 19

        E.      Controlling Retransmission ................................................................ 20

        F.      Reattachment.................................................................................. 22

        G.      The Capable Phrases ........................................................................ 24

        H.      Additional Identifiers ....................................................................... 26

IV.     CONCLUSION........................................................................................................ 27

# TABLE OF AUTHORITIES

## CASES

*800 Adept, Inc. v. AT&T Mobility, L.L.C,*
    No 5:07-CV-023-CMC, 2008 U.S. Dist. LEXIS 93179 (E.D. Tex. July 23, 2008) ........................ 8

*Alcatel USA Sourcing, Inc. v. Microsoft Corp.,*
    No. 6:06-CV-499, 2008 U.S. Dist. LEXIS 49615 (E.D. Tex. Aug. 21, 2008) ............................... 9

*Aloft Media, LLC v. Microsoft Corp.,*
    No. 6:08-CV-050, 2009 U.S. Dist. LEXIS 24124 (E.D. Tex. March 24, 2009).......................... 8, 9

*Comark Commc'ns., Inc. v. Harris Corp.,*
    156 F.3d 1182 (Fed. Cir. 1998)................................................................................................... 7

*Exxon Research & Eng'g Co. v. United States,*
    265 F.3d 1371 (Fed. Cir. 2001)............................................................................................ 20, 25

*Fenner Inv. Ltd. v. Microsoft Corp.,*
    No. 6:07-CV-8, 2008 U.S. Dist. LEXIS 65686 (E.D. Tex Aug. 22, 2008) ................................... 9

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,*
    521 F.3d 1351 (Fed. Cir. 2008)................................................................................................... 8

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005).......................................................................................... 7, 8, 23

*ReedHycalog UK, Ltd. v. Baker Hughes Oilfield Operations, Inc.,*
    No. 6:06-CV-222-LED, 2008 U.S. Dist. LEXIS 40877 (E.D. Tex. May 21, 2008).................. 8, 17

*Sri Int'l v. Matsushita Elec. Corp.,*
    775 F.2d 1107 (Fed. Cir. 1985)................................................................................................... 7

*U.S. Surgical Corp. v. Ethicon, Inc.,*
    103 F.3d 1554 (Fed. Cir. 1997)............................................................................................... 8, 24

*Ventana Med. Sys. v. Biogenex Labs., Inc.,*
    473 F.3d 1173 (Fed. Cir. 2006)................................................................................................... 7

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996)..................................................................................................... 8

## STATUTES

35 U.S.C. § 112, ¶ 2............................................................................................................... 25

## OTHER AUTHORITIES

ALAN FREEDMAN, THE COMPUTER DESKTOP ENCYCLOPEDIA
(Am. Mgmt. Ass'n 2d ed. 1999) (1996) ........................................................................ 19

FRANK HARGRAVE, HARGRAVE'S COMMC'NS DICTIONARY
(IEEE Press 2001) .................................................................................................. 11, 19

HARRY NEWTON, NEWTON'S TELECOM DICTIONARY
(CMP Books 2002) ................................................................................................. 11, 12

IEEE COMPUTER SOCIETY, IEEE STANDARD FOR LOCAL AND METROPOLITAN AREA NETWORKS:
OVERVIEW AND ARCHITECTURE
(2001) ........................................................................................................................ 11

MARTIN H. WEIK, COMMC'NS STANDARD DICTIONARY
(Chapman & Hall 3d Ed. 1996) ................................................................................. 21

MARTIN H. WEIK, COMPUTER SCIENCE AND COMMC'NS DICTIONARY VOL. I
(Kluwer Academic Pubs. 2000) ................................................................................. 20

MARTIN H. WEIK, COMPUTER SCIENCE AND COMMC'NS DICTIONARY VOL. II
(Kluwer Academic Pubs. 2000) ................................................................................. 20

MICROSOFT PRESS COMPUTER DICTIONARY
(1991) ......................................................................................................................... 20

## TABLE OF EXHIBITS

| Exhibit | No. |
|---|---|
| U.S. Patent No. 7,756,129 | 1 |
| P.R. 4-3 Joint Claim Construction and Prehearing Statement | 2 |
| Hargrave's Commc'ns Dictionary | 3 |
| Newton's Telecom Dictionary | 4 |
| Excerpt from the IEEE 802 Specification | 5 |
| The Computer Desktop Encyclopedia | 6 |
| Computer Science and Commc'ns Dictionary Vol. II | 7 |
| Computer Science and Commc'ns Dictionary Vol. I | 8 |
| Microsoft Press Computer Dictionary | 9 |
| Commc'ns Standard Dictionary | 10 |

## I.   BACKGROUND AND NATURE OF THE CASE

Plaintiffs Azure Networks, LLC and Tri-County Excelsior Foundation allege that CSR PLC, Cambridge Silicon Radio International LLC, Atheros Communications, Inc., Broadcom Corporation, Marvell Semiconductor, Inc., Qualcomm Incorporated, Ralink Technology Corporation [Taiwan], Ralink Technology Corporation [USA], and Texas Instruments Inc. (collectively, "Defendants") infringe U.S. Patent No. 7,756,129 ("the '129 patent").[1]   A copy of the Parties' P.R. 4-3 Joint Claim Construction and Prehearing Statement (Dkt. No. 231) is attached as Exhibit 2.  The parties currently dispute the construction of the following phrases that are found within the asserted claims.  These phrases are listed below.

1. MAC address(es)
2. separate class of MAC address
3. availability of the first peripheral device for communication with the hub device / availability of the peripheral device for communication with the hub device
4. availability of the hub device for peripheral device attachment
5. virtual entities
6. controlling retransmission
7. reattachment
8. capable of being used for identification in association with the first peripheral device / capable of being used for identification in association therewith
9. additional identifiers

The disputed terms and phrases are used throughout the '129 patent in the same manner that they would ordinarily be understood by one of skill in the art.  That is, the '129 patent does not use these terms in a specialized way or otherwise seek to redefine the terms to have specialized meanings.  Therefore, for each disputed term or phrase, Plaintiffs have proposed a construction that adopts the term's plain and ordinary meaning and is well-supported by the intrinsic record.  Defendants' proposed constructions, in contrast, encumber the identified claim term/phrase with extraneous limitations and/or needlessly replace straightforward and easily understood claim language with alternative words and phrases, often in a transparent attempt to

---

[1] A copy of the '129 patent is attached as Exhibit 1.

change the meaning and scope of the claims.  Further, Defendants' proposed constructions will not assist the jury's understanding the claims.

For these reasons, as detailed more fully below, Plaintiffs respectfully submit that the Court should adopt Plaintiffs' proposed claim constructions.

## II.    TECHNOLOGY AT ISSUE

### A.    The Patent-in-Suit

The '129 patent, titled "Personal Area Network with Automatic Attachment and Detachment," issued July 13, 2010, and claims priority to application No. 09/535,591 ("the '591 application"), which was filed on March 27, 2000.  Robert J. Donaghey is the sole inventor of the invention described and claimed in the '129 patent.

Mr. Donaghey conceived of and reduced to practice the invention disclosed in the '129 patent during the course of his work on a project known as BodyLAN ("Body-Local Area Network").  Mr. Donaghey began working on the BodyLAN project shortly after joining BBN Systems and Technologies ("BBN") (now Raytheon BBN Technologies) in September 1996. The BodyLAN project was focused on developing wireless personal area network technology that would allow one or more Personal Electronic Accessories ("PEA") to communicate with a central computing device via a shared network.  The early development of the BodyLAN technology was directed toward military applications that included providing a way of communicating navigational data from a PEA located on a soldier's boot to a belt-worn computer.  Mr. Donaghey's work on the BodyLAN project has resulted in numerous patents directed to his inventive technology, including the patent-in-suit.

### B.    Summary of Patented Technology

Prior to the invention disclosed in the '129 patent, the inability of more than one peripheral device to wirelessly communicate with a processing unit severely limited the field of

data communications.  '129 Pat. at 1:24-42.  In fact, connecting one or more peripheral device(s) with a processing unit was often accomplished through the use of cables, thereby greatly restricting the user's freedom of movement.  *Id*. at 1:30-37.  Furthermore, traditional wireless networks were typically limited to "a single peripheral unit with a dedicated channel of low capacity."  *Id*. at 1:38-42.  To overcome these deficiencies, the BodyLAN project and the '129 patent sought to "develop a low power data network that provides highly reliable bidirectional data communication between a host or server processor unit and a varying number of peripheral units and/or sensors while avoiding interference from nearby similar systems."  *Id*. at 1:43-47.

In furtherance of these objectives, the '129 patent discloses a network that facilitates wireless communication between two or more devices located in close proximity to one another. *Id*. at Abstract; 1:18-22.  The '129 patent refers to this close network of devices as a Personal Area Network, or PAN.  *Id*. at 3:10.  Figure 1 of the '129 patent provides an illustration of a typical PAN.



*Id*. at Fig. 1; 2:22-24.  As shown in Figure 1, a PAN may include a single hub device that is surrounded by one or more peripheral devices, or PEAs.  *Id*. at 27-30.  Exemplary features of the PAN disclosed by the '129 patent include low power consumption, a small size, the ability to "support[] wireless communication without line-of-sight limitations," the ability to "tolerate[] interference from other PAN systems operating in the vicinity," and the ability to "support[] communication among networks of multiple devices (over 100 devices)."  *Id*. at 18-23.  The

characteristic low power consumption and small size of the PAN provides added flexibility and allows a PAN to be easily integrated into a broad range of both simple and complex devices.  *See id.* at 3:23-26.

Generally speaking, the hub is central to the PAN and "orchestrates all communication in the PAN," which may include "manag[ing] the timing of the network, allocate[ing] available bandwidth among the currently attached peripheral devices participating in the PAN, and support[ing] the attachment, detachment, and reattachment of PEAs to and from the PAN."  *Id.* at 3:33-38.  The peripheral devices, on the other hand, may move in and out of range of the PAN, "may vary dramatically in terms of their complexity," and may consist of "stationary devices located near the Hub and/or portable devices that move to and away from the Hub."  *Id.* at 3:44-52.  Exemplary hub and peripheral devices include both portable and stationary devices, such as personal computers, personal digital assistants, and cellular telephones.  *Id.* at 3:44-52.

In order to communicate in a PAN, a hub and a peripheral device must connect, or "attach," with one another.  *Id.* at 10:45-52.  The '129 patent refers to this connection process as "attachment," and, indeed, the '129 patent is directed towards, *inter alia*, a novel attachment process.[2]  The subject matter of claims 14 and 27 is directed toward two such embodiments.  Claims 14 and 27 disclose a hub device and a peripheral device, respectively, that are each configured to perform the disclosed attachment process.  Claim 14 is directed to hub device[3]—

> 14.  *A hub device* for use within a personal area network, comprising: circuitry, and
> a transceiver in communication with the circuitry, the hub device configured to cause the transceiver to
> i) send a message to indicate the availability of the hub device for peripheral device attachment,
> ii) receive, from a first peripheral device, a message indicating the availability of the first peripheral device for communication with the hub

---

[2] The '129 patent also discloses processes for "detachment," "reattachment," and data communication once a hub device and one or more peripheral devices are "attached" in a personal area network.

[3] The asserted claims that depend from claim 14 will be referred to as "the hub device claims."

device,

iii) send, to the first peripheral device, a signal including a first ***peripheral device identifier***,

iv) receive, from the first peripheral device, a response,

v) send a hub response to the first peripheral device, and

vi) receive, from the first peripheral device, a second peripheral response including the first ***peripheral device identifier***.

*Id*. at cl. 14 (emphasis added).[4]   Claim 27 is directed to a peripheral device[5]—

27. ***A peripheral device*** for use within a personal area network, comprising:

circuitry, and

a transceiver in communication with the circuitry, the peripheral device configured to cause the transceiver to

i) receive a sent message from a hub device to indicate the availability of the hub device for peripheral device attachment,

ii) send, to the hub device, a message indicating the availability of the peripheral device for communication with the hub device,

iii) receive, from the hub device, a signal including a ***peripheral device identifier***,

iv) send a response to the hub device,

v) receive, from the hub device, a hub response, and

vi) send, to the hub device, a second peripheral response including the ***peripheral device identifier***.

*Id*. at cl. 27 (emphasis added).[6]

As emphasized above, claims 14 and 27 call for a "peripheral device identifier."  *Id*. at cls. 14 and 27.  Consistent with the term's plain and ordinary meaning, the parties agree that "peripheral device identifier" should be construed to mean "an element that identifies a peripheral device."[7]  As recited in the claims of the '129 patent, a peripheral device identifier serves to specify whether communications in a personal area network are to, or from, a particular peripheral device.  In other words, in the context of the personal area network, the peripheral

---

[4] Plaintiffs are not asserting independent claim 14.  Rather, Plaintiffs are asserting claims 43, 45-59, 51-53, 55, 57-59, 61, 63-64, 75, 79, 81, 95, 111, 124-129, 132, 134, 137, 140 145-148, and 156, which are dependent claims that are related to and, therefore, include the elements recited by independent claim 14.

[5] The asserted claims that depend from claim 27 will be referred to as "the peripheral device claims."

[6] Plaintiffs are not asserting independent claim 27.  Rather, Plaintiffs are asserting claim 221, 223-227, 229, 233, 236-237, 257, 259, 262-263, 302-304, 306, 311, 323, 334, which are dependent claims that are related to and, therefore, include the elements recited by independent claim 27.

[7] *See* P.R. 4-3 Joint Claim Construction Statement at 2 (attached hereto as Exhibit 2).

device identifier is claimed to distinguish communications associated with one peripheral device from communications associated with another peripheral device in the personal area network. *See e.g.*, *Id.* at cl. 19 ("19.   The device according to claim 14, wherein the hub device is configured to cause the transceiver to communicate with at least one additional peripheral device having a peripheral device identifier different from the first peripheral device identifier."); *see also* cl. 34 ("wherein the one or more identifiers are used to further identify communications between the hub device and the peripheral device.").

In addition to "peripheral device identifier," all of the asserted claims of the '129 patent (*see fn.* 4 and 6, *supra*) include the disputed claim term "MAC address(es)."  For example, claim 43 provides as follows:

> 43.   The hub device according to claim 14, wherein the hub device is configured such that a plurality of ***MAC addresses*** is capable of being used for identification in association with the first peripheral device.

*Id.* at cl. 43.[8]  Similarly, claim 221 provides as follows:

> 221.   The peripheral device according to claim 27, wherein the peripheral device is configured such that a plurality of ***MAC addresses*** is capable of being used for identification in association therewith.

'129 Pat. at cl. 221.[9]  Consistent with the term's usage in the art, "MAC address" is recited in the claims of the '129 patent to identify a particular device or entity.  For example, claim 221 recites a peripheral device that is configured such that it can be identified using a plurality of MAC addresses, i.e., identified using two or more MAC addresses.  Similarly, claim 43 recites that the hub device is configured to be capable of identifying the first peripheral device using a plurality of MAC addresses.

---

[8] The asserted "hub device claims" refer to and include claim 43 in their relational dependence back to independent claim 14.

[9] The asserted "peripheral device claims" refer to and include claim 221 in their relational dependence back to independent claim 27.

As discussed more fully below, the term "MAC address" is a well-understood and widely used industry term.  Recognizing this, the '129 patent uses the term in accordance with its plain and ordinary meaning.

## III.     APPLICABLE LEGAL PRINCIPLES

In recognition of the Court's claim construction expertise, Plaintiffs will only address those areas of claim construction believed to be most pertinent to the issues at hand.

### A.     The Claims – Not The Specification – Define the Scope Of The Invention

As this Court is well-aware, "it is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (citations omitted).  It is the language of the claims and not the specification that sets forth the limits of the invention. *Id.*  Otherwise, there would be no need for the claims. *Sri Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) ("If everything in the specification were required to be read into the claims, or if structural claims were to be limited to devices operated precisely as a specification-described embodiment is operated, there would be no need for the claims.")  Certainly, where ambiguity exists in the language of the claims, the specification "is the single best guide to [understanding] the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (citations omitted).   "The appropriate starting point, however, is always with the language of the asserted claims." *Comark Commc'ns., Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998).

Next, while the patent specification may aid the court in interpreting the meaning of disputed claim language, the Federal Circuit has routinely cautioned against limiting the scope of a claim to the embodiments disclosed in the specification. *Ventana Med. Sys. v. Biogenex Labs., Inc.*, 473 F.3d 1173, 1181 (Fed. Cir. 2006) ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims

to those embodiments.") (quoting *Phillips*, 415 F.3d at 1323); *see also Aloft Media, LLC v. Microsoft Corp.,* No. 6:08-CV-050, 2009 U.S. Dist. LEXIS 24124, at \*18-19 (E.D. Tex. March 24, 2009) ("The Court finds that [Defendant's] proposed construction impermissibly reads a feature of the preferred embodiment into the claims as a limitation.")[10]

### B.    Claim Terms Used In Accordance With Their Ordinary Meaning Do Not Require Construction

The words of a claim "are generally given their ordinary and customary meaning." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  "The purpose of claim construction is to resolve disputed meanings and technical scope of claim limitations, clarifying and when necessary explaining claim scope, so the fact finder may determine infringement." *ReedHycalog UK, Ltd. v. Baker Hughes Oilfield Operations, Inc.*, No. 6:06-CV-222-LED, 2008 U.S. Dist. LEXIS 40877, at \*5 (E.D. Tex. May 21, 2008) (citing *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) (quoting *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997)).

Although claim construction is a matter of law, the Court is not "required to provide a new definition or rewrite a term," such as when a term carries its plain and ordinary meaning. *800 Adept, Inc. v. AT&T Mobility, L.L.C*, No 5:07-CV-023-CMC, 2008 U.S. Dist. LEXIS 93179, at \*29-30 (E.D. Tex. July 23, 2008).  Rather, the Court's obligation is to resolve the parties' fundamental disputes regarding the scope of the asserted claims.  *ReedHycalog UK, Ltd.*, No.

---

[10]*See also Retractable Techs., Inc. v. Becton Dickinson & Co.*, 2009 U.S. Dist. LEXIS 73301, \*19-21 (E.D. Tex. Jan. 20, 2009) (J. Folsom) (indicating that, absent "clear" intention by the patentee to the contrary, "when the specification discloses only a single preferred embodiment, limitations from that embodiment generally should not be imported into the claim language"); *Saxon Innovations, LLC v. Nokia Corp.*, 2009 U.S. Dist. LEXIS 67019, \*28-31 (E.D. Tex. July 30, 2009) (J. Love) (acknowledging a single embodiment contained within the specification, yet declining to import the limitations of the embodiment into the claim); *Foodie Partners v. Jamba Juice Co.*, 2007 U.S. Dist. LEXIS 80345, \*15 (E.D. Tex. Oct. 30, 2007) (J. Love) ("Only if the patentee expresses clear disavowal of any other configuration should the Court limit the claims only to the preferred embodiment."); *Produits Berger S.A. v. David M. Schemenauer*, 2007 U.S. Dist. LEXIS 13370, \*20 (E.D. Tex. Feb. 27, 2007) (J. Love) ("although the exemplary embodiment is round or circular, … it is inappropriate to limit the claim by imposing a limitation found, not in the claim, but only in the specification or drawing, or only in a preferred embodiment.").

6:06-CV-222, slip op. at 2, 2008 U.S. Dist. LEXIS 40877, at *5 (citation omitted).  This Court

has routinely rejected the argument that construction of claim terms is *required* to resolve

disputes concerning claim scope.  *Aloft Media, LLC v. Adobe Systems Inc.*, No. 6:07-CV-355,

slip op. at 1 (E.D. Tex. Sep. 24, 2008).[11]

## III.   CLAIM TERMS AT ISSUE

In order to streamline the issues and to facilitate an efficient presentation, Plaintiffs have

organized the disputed terms and phrases into groupings where possible.  Plaintiffs identify the

following eight categories:

A.  MAC Address

B.  Separate Class of MAC Address

C.  The Availability Phrases

D.  Virtual Entities

E.  Controlling Retransmission

F.  Reattachment

G.  The Capable Phrases

H.  Additional Identifiers

### A.   MAC Address

The term MAC address is significant in that all of the asserted claims contain the "MAC

address" limitation either directly or via dependency upon a claim that includes the term.  For

this term, Plaintiffs propose a construction that comports with both the intrinsic evidence and the

understanding by one of ordinary skill in the art.  Plaintiffs take issue with Defendants' proposed

construction for "MAC address" because it impermissibly imports a limitation that is contrary to

the specification and the understanding of one of ordinary skill in the art.  The parties' competing

constructions are set forth below.

---

[11]*See also Fenner Inv. Ltd. v. Microsoft Corp.*, No. 6:07-CV-8, 2008 U.S. Dist. LEXIS 65686 (E.D. Tex Aug. 22, 2008); *Alcatel USA Sourcing, Inc. v. Microsoft Corp.*, No. 6:06-CV-499, 2008 U.S. Dist. LEXIS 49615 (E.D. Tex. Aug. 21, 2008).

| "MAC address" | |
| --- | --- |
| **Plaintiffs' Proposed Construction[12]** | **Defendants' Proposed Construction** |
| an address that uniquely identifies a device or group of devices on a shared communication medium | a device identifier created by the hub device |

As employed in the claims of the '129 patent, "MAC address" means "an address that uniquely identifies a device or group of devices on a shared communication medium."  For example, claims 43 and 221 of the '129 patent provide:

> 43.   The hub device according to claim 14, wherein the hub device is configured such that a plurality of ***MAC addresses*** is capable of being used for identification in association with the first peripheral device.

'129 Pat. at cl. 43 (emphasis added).

> 221. The peripheral device according to claim 27, wherein the peripheral device is configured such that a plurality of ***MAC addresses*** is capable of being used for identification in association therewith.

*Id*. at cl. 221 (emphasis added).

The '129 patent is directed toward the ability of hub and peripheral devices to wirelessly connect to one another to facilitate bidirectional data communications between the devices in a personal area network (PAN).  *Id*. at Abstract & 1:18–22.  One of the ways that the devices are identified is through the use of a "MAC address."  *See, e.g.*, *Id*. at 3:27–32 and 3:60–4:3.

Plaintiffs' construction is consistent with the ordinary meaning of this claim term as understood by a person of skill in the art in view of the '129 patent.  MAC addresses are commonly understood to be unique addresses assigned to network interfaces for communications on the physical network segment within various media/medium communication technologies.

---

[12] Since filing the parties' P.R. 4-3 Joint Claim Construction Statement (Dkt. No. 231), Plaintiffs have amended their proposed construction of "MAC address" to more precisely focus on the disputed issues concerning the meaning of this term.  Plaintiffs are also of the view that their amended construction will be easier to understand by lay persons serving on the jury.

As discussed in countless technical publications, MAC addresses are utilized to uniquely identify electronic devices on a shared communication medium, such as an Ethernet based local area network ("LAN").  *See e.g.*, FRANK HARGRAVE, HARGRAVE'S COMMC'NS DICTIONARY at 313 (IEEE Press 2001) (defining MAC address as "a 48 bit number unique to each network interface card (NIC).  Generally, the number is programmed into the NIC at the time of manufacture; hence, it is LAN and location independent.") (attached as Ex. 3); *see also* HARRY NEWTON, NEWTON'S TELECOM DICTIONARY 450 (CMP Books 2002) (explaining that a MAC address "is in the form of a 48-bit number, formally known as an EUI-48 (Extended Unique Identifier-48), which is ***unique*** to each LAN (Local Area Network).") (emphasis added) (attached as Ex. 4).  In fact, the acronym "MAC" is well known within the industry as standing for "**M**edium **A**ccess **C**ontrol" in reference to a communications protocol sub-layer  *See e.g.*, EX. 3, HARGRAVE'S COMMC'NS DICTIONARY at 313.

To ensure the requisite uniqueness required and/or demanded by electronic device manufacturers and consumers, MAC addresses are formed according to rules and conventions that are specified by the Institute of Electrical and Electronic Engineers (IEEE).  *See e.g.*, IEEE COMPUTER SOCIETY, IEEE STANDARD FOR LOCAL AND METROPOLITAN AREA NETWORKS: OVERVIEW AND ARCHITECTURE 20-23 (2001) (attached as Ex. 5).  The IEEE provides that MAC addresses can be universally administered addresses or locally administered addresses.  *Id.* Universally administered MAC addresses include an organizationally unique identifier (OUI) component that is administered by IEEE to ensure global uniqueness of the MAC address:

> The concept of universal addressing is based on the idea that all potential members of a network need to have a unique identifier (if they are going to coexist in the network).  The advantage of a universal address is that a station with such an address can be attached to any LAN in the world with an assurance that the address is unique.

A 48-bit address consists of two parts.  The first 24 bits correspond to the OUI as assigned by the IEEE, except that the assignee may set the LSB of the first octet to 1 for group addresses or set it to 0 for individual addresses.

\*\*\*

Varying the last 24 bits in the block of MAC addresses for a given OUI allows the OUI assignee approximately 16 million unique individual addresses and 16 million group addresses that no other organization may assign (i.e., universally unique).

\*\*\*

The method that an assignee uses to ensure that no two of its devices carry the same address will, of course, depend on the assignment or manufacturing process, the nature of the organization, and the organization's philosophy.  ***However, the users of networks worldwide expect to have unique addresses.***  The ultimate responsibility for assuring that user expectations and requirements are met, therefore, lies with the organization offering such devices.

*See* Ex. 5 at 20-21 (emphasis added).  While the IEEE permits some flexibility in MAC address assignment, the recommended approach is for each device to have its own unique MAC address. *Id*. at 22 ("An issue to be considered is the nature of the device to which uniqueness of address assignment applies.  The recommended approach is for each device associated with a distinct point of attachment to a LAN to have its own unique MAC address.").  This approach avoids the problems associated with address collisions when multiple devices are communicating on the same communication medium.  *Id*.

Throughout the '129 patent, the term "MAC address" is used in accordance with its customary meaning in the art.  For example, the specification states "[e]ach device is identified by a Media Access (MAC) address."  '129 Pat. at 3:31–32.  Furthermore, the '129 patent specifically contemplates the use of MAC addresses in commonly known fashions to identify both hub and peripheral devices.  For example, the specification states that, "[t]he Hub 110 uses MAC addresses to identify itself and the PEAs 120. The Hub 110 uses its own MAC address to broadcast to all PEAs 120. The Hub 110 might also use MAC addresses to identify virtual PEAs within any one physical PEA 120."  *Id*. at 3:60-64.

12

In marked contrast to the Plaintiffs' construction, Defendants have proposed that "MAC address" means "a device identifier ***created by*** the hub device."  *See* Ex. 2, P.R. 4-3 Joint Claim Construction and Prehearing Statement at 2 (emphasis added).  Defendants' construction imposes an overly restrictive requirement that a MAC address must be *created by* a particular device—a hub device.  This proposed construction is contrary to the term's ordinary meaning and has apparently been devised with the goal of generating a non-infringement argument. Under Defendants' proposed construction, it would be impossible to ascertain whether an address is a "MAC address" unless it could be determined where and how the address originated.  Even then, additional inquiry would be required to determine whether 1) the address was "created by" a particular device; and 2) if *created by* the device, whether the device is a "hub device."

In comparing the parties' competing constructions, it can be seen that Defendants' proposed construction for "MAC address" is unrelated to any characteristic, quality, or property that would ordinarily be associated with the term by persons of ordinary skill in the art.  Rather, Defendants' construction is based entirely on the unsupportable notion that a "MAC address" must be *created by* a particular device, and nothing more.  Defendants' proposed construction of "MAC address" is, therefore, unduly limiting and contrary to the ordinary usage of the term in the patent specification.

Because Plaintiffs' proposed construction parallels both the intrinsic evidence and the understanding of one of ordinary skill in the art, the Court should construe "MAC address(es)" to mean **"an address that uniquely identifies a device or group of devices on a shared communication medium."**

### B.     Separate Class of MAC Address

Plaintiffs submit that no construction is necessary for the phrase "separate class of MAC address," which appears in claims 63.  Plaintiffs believe that only the "MAC addresses" portion

of the phrase "separate class of MAC addresses" requires construction (as described above) and, to the extent that the Court believes a construction is necessary, Plaintiffs have provided an alternative construction to reflect Plaintiffs' position.  Much like they do with the term MAC address, Defendants seek to impose an unsupportable limitation.   The parties' competing constructions are set forth below.

| "separate class of MAC address" | |
| --- | --- |
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary<br><br>Alternatively,<br><br>separate class of an address that uniquely identifies a device or group of devices on a shared communication medium | MAC address with a different configuration |

From the parties' meet and confers, Plaintiffs understand Defendants' position to be that each "class of MAC address" requires a different *physical* configuration of the MAC address. That is, under Defendants' proposed construction, the physical arrangement, ordering, and/or makeup of the MAC address must be different to constitute a "separate class of MAC address." Contrary to Defendants' narrow interpretation, Plaintiffs' contend that the plain and ordinary meaning of the disputed phrase "separate class of MAC address" includes any classification scheme or categorization of MAC addresses, including functional classes that are predicated on how a MAC address is utilized.   Consistent with Plaintiffs' understanding, the '129 patent discloses one classification scheme in which MAC addresses are, in fact, categorized based upon how they are utilized: (1) a MAC address utilized by a central hub device; (2) MAC addresses utilized to facilitate peripheral device attachment to a hub device; and (3) MAC addresses assigned to a peripheral devices by a hub device for utilization after attachment is completed. '129 Pat. at 9:11–23.  The '129 patent does not, as Defendants suggest, equate the "different classes" to a "different configuration," i.e., physical arrangement of the address information.

For these reasons, Plaintiffs respectfully submit that the term "separate class of MAC address" does not need to be construed.  Alternatively, should the Court find that a construction is necessary, Plaintiffs propose construing the term to mean, **"separate class of an address that uniquely identifies a device or group of devices on a shared communication medium."**

### C.      The Availability Phrases

The three availability phrases are significant in that at least one disputed phrase is present in each asserted claim by way of their usage in claims 14 and 27, which are the independent claims from which all of the asserted claims depend.  As previously described, the '129 patent discloses, among other things, a novel approach for attaching one or more peripheral devices to a hub device in order to facilitate communication between the devices in a PAN.  While the phrases at issue are relatively straightforward, to the extent constructions are needed, Plaintiffs have proposed constructions that simplify and provide additional guidance for the fact finder. Defendants' constructions do not clarify, but instead, needlessly obfuscate claim language that would be familiar to the jury.  The parties' competing constructions are set forth below.

| "availability of the hub device for peripheral device attachment" ||
| --- | --- |
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| the hub device is available for unattached peripheral devices to establish an attachment relationship | availability of an identified hub device for attachment to any peripheral device |

| "availability of the first peripheral device for communication with the hub device" "availability of the peripheral device for communication with the hub device" ||
| --- | --- |
| **Plaintiffs' Proposed Construction[13]** | **Defendants' Proposed Construction** |
| the [first] peripheral device is available to establish an attachment relationship with the hub device | availability of the [first] peripheral device for communication with the hub device in step (i) |

---

[13] Plaintiffs have added the bracketed phrase "[first]" to its proposed construction to account for its recitation in one of the disputed claim phrases.

The phrases, "availability of the hub device for peripheral device attachment" and "availability of the first peripheral device for communication with the hub device" are recited in claim 14. *Id*. at cl. 14. The phrase, "availability of the peripheral device for communication with the hub device" is recited in claim 27. *Id*. at cl. 27. Claim 14 is exemplary of the claims' use of these phrases—

> 14. A hub device for use within a personal area network, comprising:
> circuitry, and
> a transceiver in communication with the circuitry, the hub device configured to cause the transceiver to
> i) send a message to indicate the **availability of the hub device for peripheral device attachment**,
> ii) receive, from a first peripheral device, a message indicating the **availability of the first peripheral device for communication with the hub device**,
> iii) send, to the first peripheral device, a signal including a first peripheral device identifier,
> iv) receive, from the first peripheral device, a response,
> v) send a hub response to the first peripheral device, and
> vi) receive, from the first peripheral device, a second peripheral response including the first peripheral device identifier.

*Id*. at cl. 14 (emphasis added).

As used in the claims, the availability phrases describe the purpose of the messages exchanged in the first two claim elements for attaching a peripheral device to a hub device "for communication" in a PAN. For example, the "availability of the hub device for peripheral device attachment" is indicated by a message sent by a hub device. *Id*. at cl. 14. Likewise, the "availability of the first peripheral device for communication with the hub device" is indicated by a message sent by a first peripheral device. *Id*. at cls. 14 & cl. 27.

Plaintiffs' construction for "availability of the hub device for peripheral device attachment" clarifies that "the hub device is available for <u>unattached</u> peripheral devices to establish an <u>attachment relationship</u>." (emphasis added). In other words, as expressly provided by Plaintiffs' construction for this phrase, the purpose of the recited message is to indicate to

unattached peripheral devices that the hub is available for attachment.  Similarly, Plaintiffs' construction for the other two availability phrases clarifies that the purpose of the recited message is to indicate to the hub device that the peripheral device is available for attachment.  As detailed above, the '129 patent is directed to, *inter alia*, a process for connecting a hub device to one or more peripheral devices for communication in a PAN – i.e., "attachment" – and, in consideration of this purpose, and in furtherance of resolving any apparent dispute concerning claim scope, Plaintiffs' constructions are correct and should be adopted by the Court.  *Id.* at 1:18-22.  *See ReedHycalog UK*, No. 6:06-CV-222-LED, 2008 U.S. Dist. LEXIS 40877, at *5 ("The purpose of claim construction is to resolve disputed meanings and technical scope of claim limitations, clarifying and when necessary explaining claim scope, so the fact finder may determine infringement.").

Defendants' constructions, to the contrary, fail to clarify the scope of the claims and, in many cases impart limitations that are not supported by the specification.  For example, Defendants' proposed construction for "availability of the hub device for peripheral device attachment," provides that the recited message indicates that the hub device is available for attachment "to *any* peripheral device." (emphasis added).  In other words, Defendants' construction does not distinguish between an attached peripheral device and an unattached peripheral device and suggests that a hub device would create an attachment relationship with a peripheral device that was already attached.  This construction is contrary to the disclosure of the '129 patent and is a transparent attempt to alter the scope of the claims.  Furthermore, for this phrase, Defendants impose the additional requirement "identified" to describe the claimed hub device.  This additional limitation is confusing and appears to suggest the hub device was "identified" at some previous point.  The language of claim 14, as written, is relatively straightforward and does not require Defendants' additional "identified" limitation.

Turning to the remaining availability phrases, Defendants seek to impose an unnecessary addition to otherwise straightforward claim language.  Indeed, rather than construe the phrase, Defendants seek only to add the phrase "**in step (i)**" to the claim language.  In doing so, for claim 14, Defendants impose a causal relationship between the message sent by the hub device in element (i) (indicating its availability for peripheral device attachment) and the message received by the hub device in element (ii) (indicating that the peripheral device is available for communication with the hub device).   In other words, Defendants desire to rewrite the claim to require the message received in element (ii) to be *in response* to the message sent in element (i).  Claim 14, however, imposes no such relationship between the two messages.  For example, the message sent by the hub device in element (i) may be a broadcast message repeatedly sent to indicate its availability for peripheral device attachment. *See id*. at cl. 58.  Regardless of whether the broadcast message is successfully received, the hub device may still receive a message from nearby peripheral devices indicating that they are available for communication with the hub device.  Plainly, Defendants' proposed constructions seek to narrow the scope of the claims and should therefore be rejected.

For these reasons, Plaintiffs respectfully request that the Court construe "availability of the hub device for peripheral device attachment" to mean **"the hub device is available for unattached peripheral devices to establish an attachment relationship"**; and the phrases, "availability of the first peripheral device for communication with the hub device" and "availability of the peripheral device for communication with the hub device" to mean **"the [first] peripheral device is available to establish an attachment relationship with the hub device."**

18

**D.     Virtual Entities**

Plaintiffs' proposed construction for this term is in accord with how one of ordinary skill in the art would understand the phrase in light of the '129 patent.  Defendants have chosen to ignore the fact that "virtual entity" is a widely used term in the computer industry and instead assert that the term is incapable of construction and, therefore, indefinite.  Dkt. No. 234-1. Defendants have filed a letter brief, requesting leave to file a motion for summary judgment for indefiniteness, and, Plaintiffs will address such argument in response to the pending letter brief.[14] "Virtual entities" is recited by claims 45, 46, and 224.  The constructions offered by both parties for this term are provided below.

| "virtual entities" | |
| --- | --- |
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| a simulation or emulation of physical entities, or subsystems of a system | Indefinite |

Claim 45 is exemplary of the patent's use of this term and provides that–

45.  The hub device according to claim 43, wherein the first peripheral device includes a plurality of **virtual entities**.

'129 Pat. at cl. 45 (emphasis added).  The term "virtual entity" is commonly used in the field of digital communications, for example:

- "virtual . . . is often used to define a feature or state that is simulated in some fashion . . . ."  ALAN FREEDMAN, THE COMPUTER DESKTOP ENCYCLOPEDIA 970 (Am. Mgmt. Ass'n 2d ed. 1999) (1996) (attached as Ex. 6);

- "virtual [is a] description of an emulated device or process that is perceived to be something that it is not.  A virtual entity can be treated in every aspect as if it were the entity being emulated–an entity that apparently exists but in reality does not."  Ex. 3, HARGRAVE'S COMMC'NS DICTIONARY at 568;

- "entity [is a] term used to refer [to] the abstraction of a device . . . ."  Ex. 3, HARGRAVE'S COMMC'NS DICTIONARY at 191;

---

[14] Plaintiffs disagree that the term "virtual entities" is indefinite and respectfully submits that such term is routinely employed in this technical field and readily understood by those of skill in the art.

- "virtual [is]. . . [,i]n a system, such as . . . a subsystem of the system . . . pertaining to the quality or characteristic of being a real system other than it actually is . . ." MARTIN H. WEIK, COMPUTER SCIENCE AND COMMC'NS DICTIONARY VOL. II 1803 (Kluwer Academic Pubs. 2000) (attached as Ex. 7);

- "entity . . . [i]n open systems architecture, an active element that lies within a subsystem . . . ." MARTIN H. WEIK, COMPUTER SCIENCE AND COMMC'NS DICTIONARY VOL. I 525 (Kluwer Academic Pubs. 2000) (attached as Ex. 8); and

- "virtual [is a]n adjective used to describe a device or service that is perceived to be what it is not in actuality." MICROSOFT PRESS COMPUTER DICTIONARY 363 (1991) (attached as Ex. 9).

As demonstrated by these technical publications, the term "virtual entities" is clearly amenable to construction and is, therefore, not indefinite. *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001) (holding that a claim is not indefinite "if the meaning of the claim is discernable."). Plaintiffs' proposed construction adheres to the term's plain and ordinary meaning, which is consistent with its use in the '129 patent. *See* '129 Pat. at 3:62-63 ("The Hub 110 might also use MAC addresses to identify virtual PEAs within any one physical PEA 120.")

For this reason, Plaintiffs respectfully request that the Court construe "virtual entities" to mean **"a simulation or emulation of physical entities, or subsystems of a system."**

### E. Controlling Retransmission

This term appears in dependent claims 55 and 233. For this term, Plaintiffs propose a construction that clarifies its meaning for the fact finder. The parties' competing constructions are set forth below.

| "controlling retransmission" | |
|---|---|
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| exerting control over a repeated transmission to the same addressee of a previously transmitted signal | Plain and ordinary meaning |

In the context of the '129 patent, "controlling retransmission" means "exerting control of a repeated transmission to the same addressee of a previously transmitted signal."  The patent specification identifies the link layer transport (LLT) as the layer of software that transmits snippets (data blocks) to the receiving device.  *Id*. at 6:1–2.  Retransmission of snippets also occurs in this software layer.  *Id*. at 6:2–6.  The hub device's LLT employs retransmission control "to ensure that each snippet is delivered reliably to its client (e.g., PEA LLT)."  *Id*. at 6:32–35.  Thus, the hub device exerts control over a repeated transmission to a particular peripheral device.  In the claims at issue, communications to the peripheral device are identified by the peripheral device identifier.  The claims also specify that the peripheral device is capable of being identified using the plurality of MAC addresses.  Thus, Plaintiffs' proposal refers to the particular peripheral device to which the transmission is being re-sent as the "same addressee." *See Id*. at cls. 55 & 233.

Not only is Plaintiffs' proposed construction consistent with the intrinsic record, but it is also consistent with how one of ordinary skill in the art would understand the term retransmission.  For example, the Communications Standard Dictionary defines "retransmission" as "[a] repeated transmission of a previously transmitted signal or message."  MARTIN H. WEIK, COMMC'NS STANDARD DICTIONARY 853 (Chapman & Hall 3d Ed. 1996) (attached Ex. 10).  And, in the context of the '129 patent, that retransmission is to the same peripheral device as the previously transmitted signal.  '129 Pat. at 6:32–35.  Plaintiffs' proposed construction is therefore the plain and ordinary meaning of "controlling retransmission" as one of skill in the art would understand it in the context of the '129 patent.

Defendants incorrectly argue that the plain and ordinary meaning of retransmission would not be limited to the same addressee of a previously transmitted signal.  Such an argument conflates the concepts of transmission and retransmission.  If the hub device sends a signal to

21

peripheral device 1 and sends the same signal to peripheral device 2, each of those actions is a transmission.  In that scenario, it does not make sense to label the signal transmitted to peripheral device 2 as a "retransmission."   Rather, as contemplated by the '129 patent, a retransmission occurs when the hub device sends a signal to peripheral device 1, determines that it needs to re-send that signal, and repeats the transmission of the signal to peripheral device 1.  *See, e.g.*, *id.* at 6:1–8 ("The LLT 440 transmits the snippet across the network to the receiving device. . . and employs . . . retransmissions.  This is illustrated in Fig. 5 by the bidirectional arrow between the LLT 440 layers marked with '(n+m).'"); *see also id.* at 5:55–60 ("Figure 5 is an exemplary diagram of communication processing by the layers of the software architecture . . . This example assumes that the sending node is the Hub 110 and the receiving node is a PEA 120.").

Because Plaintiffs' proposed construction comports with the intrinsic evidence, the Court should construe "controlling retransmission" to mean **"exerting control over a repeated transmission to the same addressee of a previously transmitted signal."**

F.      **Reattachment**

For this term, the principal dispute between the parties is that Defendants seek to narrow the claims by importing an "[e]xemplary" embodiment from the patent specification.  *Id.* at 12:41 ("***Exemplary*** Detachment and Reattachment Processing") (emphasis added).  The term "reattachment" appears in claims 262 and 263.  The parties' competing constructions are set forth below.

| "reattachment" | |
| --- | --- |
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| reestablish an attachment relationship | initiating attachment after detachment caused by exceeding a predefined threshold |

"Reattachment" as used in the '129 patent means to reestablish an attachment relationship.  Claim 262 ultimately depends from claim 27 and is directed at a peripheral device

for use within a personal area network "wherein the peripheral device is configured for reattachment." *Id*. at cl. 262.  Claim 263 further delineates that the reattachment of claim 262 "involves an attach request using a previously-assigned address." *Id*. at cl. 263.  The patentee explained reattachment processing in the specification. *See Id*. at 12:41–13:18 & Fig. 13.  If the peripheral device determines that it has become detached from the hub device, it attempts to reattach to the hub device using similar attachment processing as described by the patentee for the initial attachment.  *Id*. at 13:4–7.  Thus, consistent with this intrinsic evidence, Plaintiffs propose that "reattachment" means to "reestablish an attachment relationship."

Defendants' proposed construction erroneously imports an additional limitation regarding how detachment occurs and is incorrect for at least two reasons. *See Phillips*, 415 F.3d at 1323 (warning against confining claims to embodiments disclosed in the specification).  First, it makes no sense to define reattachment in terms of how detachment occurs because reattachment of a peripheral device is a separate process.  Once the peripheral device determines it is detached, it attempts to reattach. *Id*. at 13:1–18.  How the detachment occurred is inconsequential to how the peripheral device reattaches to the hub device.

Second, Defendants' construction unnecessarily limits the scope of "reattachment" to only reattachment after a specific kind of detachment, which is inconsistent with the specification's broad disclosure of several ways in which a peripheral device may become detached from the hub device.  Specifically, detachment can occur: (1) if the peripheral device's heartbeat counter exceeds a predetermined threshold; (2) if the peripheral device attempts to reattach when it is not detached; and (3) if the hub device has detached the peripheral device, e.g., when the peripheral device has gone out of range of the hub device. *Id*. at 13:1–18.  Thus, Defendants' proposed construction should be rejected because it defines "reattachment" in terms of detachment and erroneously imports a limitation requiring a specific type of detachment.

For these reasons, Plaintiffs submit that "reattachment" should be construed to mean **"reestablish an attachment relationship."**

### G.  The Capable Phrases

Plaintiffs contend that these phrases need no construction, but rather are readily and easily understood as they stand.  Defendants assert that these phrases are indefinite and have filed a letter brief, requesting leave to file a motion for summary judgment of indefiniteness. [15] Dkt. No. 234-1.  Plaintiffs will address such argument only to the extent Defendants are permitted by the Court to file a motion for summary judgment for indefiniteness.

| "capable of being used for identification in association with the first peripheral device" "capable of being used for identification in association therewith" | |
| --- | --- |
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary | Indefinite |

There is no need to construe the "capable of" phrases recited by claims 43 and 221 because these phrases are easily understandable.  *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (Claim construction "is not an obligatory exercise in redundancy.").  Claim 43 depends from claim 14 and additionally requires that "the hub device is configured such that a plurality of MAC addresses is *capable of being used for identification in association with the first peripheral device*."  '129 Pat. at cl. 43 (disputed language in bold). Whereas claim 43 focuses on the hub device, claim 221 focuses on a peripheral device. Specifically, claim 221 depends from claim 27 and additionally requires that "the peripheral device is configured such that a plurality of MAC addresses is *capable of being used for identification in association therewith*."  *Id*. at cl. 221 (disputed language in bold).

---

[15] Plaintiffs reserve the right to further respond to Defendants' indefiniteness arguments for the capable phrases, "additional identifiers" and "virtual entities."

The "capable of" phrases employ words and phrases that are used in everyday parlance and will, therefore, be easily understood by lay jurors.   While Plaintiffs do not believe construction of these phrases is needed, if the Court is of the view that construction would be helpful to the jury, it can be seen that when read in the context of surrounding claim language the phrase "capable of being used for identification in association with the first peripheral device" is understood to mean "capable of being used by the hub device to distinguish the first peripheral device from other devices."   Likewise, when read in the context of claim 221, the phrase "capable of being used for identification in association therewith" is readily understood to mean "capable of being used to distinguish the peripheral device from other devices."

Defendants erroneously allege that the "capable of" phrases are indefinite under 35 U.S.C. § 112, ¶ 2.   However, patent claims fulfill the definiteness requirement of § 112, ¶ 2 if one skilled in the art understands the metes and bounds of the claim when read in light of the specification.   *Exxon Research & Eng'g*, 265 F.3d at 1375.   A claim is not indefinite "if the meaning of the claim is discernible, even though the task [of construing the claim] may be formidable and the conclusion may be one over which reasonable persons will disagree."   *Id*. The task of construing the "capable of" phrases cannot legitimately be characterized as formidable here—the "capable of" phrases have their plain meaning and there is no reason to construe them any differently or to find them indefinite.   Indeed, the '129 patent includes numerous examples of how MAC addresses may be used to distinguish one peripheral device from another.   *See, e.g.*, '129 Pat. at Figs. 9B, 9C, & 11–12; 1:55–2:14; 3:10–4:4 ("Each device is identified by a Media Access (MAC) address. . . . The Hub 110 might also use MAC addresses to identify virtual PEAs within any one physical PEA 120. . . . The PEA 120 responds to the Hub 110 if it identifies its own MAC address or the Hub MAC address in the token . . ."); *id*. at 8:8– 10:41 (providing disclosures regarding exemplary communications that use MAC addresses to

identify each peripheral device); and *id*. at 10:45–13:18 (disclosing exemplary attachment processing that includes assigning MAC addresses to each peripheral device).

For these reasons, Plaintiffs contend that the phrases "capable of being used for identification in association with the first peripheral device" and "capable of being used for identification in association therewith" do not need to be construed by the Court.

## H.     Additional Identifiers

During the meet and confer process leading up to the parties' filing of the P.R. 4-3 Joint Claim Construction Statement, the parties agreed to construe the term "peripheral device identifier" to mean "an element that identifies a peripheral device."  *See* Ex. 2, P.R. 4-3 Joint Claim Construction Statement at 2 (Dkt. No. 231).  The Plaintiffs offered a very similar construction for the term "additional identifies"–meaning "one or more additional elements that identifies."  Just prior to the filing of the P.R. 4-3 Joint Claim Construction Statement, however, the Defendants countered with an offer to construe the term to mean "one or more elements that identifies, other than the first peripheral device identifier."  Plaintiffs subsequently offered to adopt the Defendants' proposal to resolve the parties' dispute.  Defendants have now indicated that they are presently unwilling to agree to the compromise construction they proposed.

This term appears in claims 81, 95, and 259.  The parties' competing constructions are provided below.

| "additional identifiers" | |
|---|---|
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| one or more elements that identifies, other than the first peripheral device identifier<br><br>(as proposed by Defendants during P.R. 4-3 meet and confer process) | Indefinite |

In accordance with the plain and ordinary usage of the term, and in consideration of the parties' agreed construction for the term "peripheral device identifier," Plaintiffs have adopted

the construction for "additional identifiers" proposed by Defendants during the meet and confer process.  Plaintiffs have adopted this construction in the interest of resolving the parties' dispute prior to the claim construction hearing.  To the extent that the Defendants continue to assert that this term is indefinite, Plaintiffs will address such argument in response to any motion for summary judgment for indefiniteness.  As demonstrated by Defendants' offer to construe the term to mean "one or more elements that identifies, other than the first peripheral device identifier," Defendants actually possess a very clear understanding of this term.

For these reasons, Plaintiffs respectfully request that the Court define "additional identifiers" to mean **"one or more elements that identifies, other than the first peripheral device identifier."**

## IV.     CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully requests asks the Court to enter its constructions for the nine terms/phrases in dispute.

DATED:  October 16, 2012                         Respectfully submitted,

 /s/  Danny Williams
Danny L. Williams
Texas State Bar No. 21518050
danny@wmalaw.com
Christopher N. Cravey
Texas State Bar No. 24034398
ccravey@wmalaw.com
David K. Wooten
Texas State Bar No. 24033477
dwooten@wmalaw.com
David Morehan
Texas State Bar No. 24065790
dmorehan@wmalaw.com
Leisa Talbert Peschel
Texas State Bar No. 24060414

lpeschel@wmalaw.com
WILLIAMS, MORGAN & AMERSON, P.C.

10333 Richmond, Suite 1100
Houston, Texas 77042
Telephone:  (713) 934-7000
Facsimile:  (713) 934-7011
Eric M. Albritton
Texas State Bar No. 00790215
ema@emafirm.com
Stephen E. Edwards
Texas State Bar No. 00784008
see@emafirm.com
Debra Coleman
Texas State Bar No. 24059595
drc@emafirm.com
Michael A. Benefield
Texas State Bar No. 24073408
mab@emafirm.com
ALBRITTON LAW FIRM
P.O. Box 2649
Longview, Texas 75606
Telephone:  (903) 757-8449
Facsimile:  (903) 758-7397

**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).  Any other counsel of record will be served by facsimile transmission and/or first class mail on October 16, 2012.

/s/ Rita Burks, Litigation Paralegal